## GENERAL TELEPHONE & ELECTRONICS CORPORATION

v.

## The UNITED STATES.

### No. 208-57.

United States Court of Claims.

July 15, 1966.

Daniel M. Gribbon, Washington, D. C., for plaintiff; Newell W. Ellison, Washington, D. C., attorney of record. Robert E. O'Malley, Covington & Burling, Washington, D. C., Theodore F. Brophy and Robert Adelson, New York City, of counsel.

Robert Livingston, Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant. Lyle M. Turner and Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

## OPINION

PER CURIAM.*

*Cooperative Advertising Plan*

This case presents for the consideration of the court a legal question with which the court has already dealt in another connection, i. e., whether amounts used by a manufacturer to reimburse retailers for part of their costs in locally advertising the manufacturer's products, under a cooperative advertising plan devised and administered by the manufacturer, constituted price readjustments by the manufacturer that entitled it to an excise tax refund under Section 3443(a)(2) of the Internal Revenue Code of 1939 (53 Stat. 417).

The plaintiff, General Telephone & Electronics Corporation, is a New York

---

* This opinion incorporates, with certain changes in discussion and result with regard to promotional activities, the opinion prepared, at the direction of the court under Rule 57(a), by Trial Commissioner Mastin G. White.

854

corporation. It is the surviving corporation resulting from the merger on March 5, 1959, of General Telephone Corporation, a New York corporation, and Sylvania Electric Products, Inc., a Massachusetts corporation. The merger occurred after the petition in this case was filed on April 30, 1957, by Sylvania Electric Products, Inc. Following the merger, General Telephone & Electronics Corporation was substituted as the party plaintiff. (For the sake of convenience, Sylvania Electric Products, Inc., the original plaintiff, will usually be referred to hereafter in the opinion as "Sylvania," and General Telephone & Electronics Corporation, the corporation that survived the merger, will usually be referred to as "the plaintiff.")

During the period that is involved in the present litigation (from March 1, 1951, through December 31, 1954), Sylvania, through its Radio and Television Division, manufactured radio and television receiving sets at a factory located in Buffalo, New York. At that time, Chapter 29, of the Internal Revenue Code of 1939, as amended, imposed excise taxes upon a number of commodities sold by manufacturers. Among the commodities affected were radio and television receiving sets. Section 3404 of the 1939 Code, as amended, imposed upon such articles sold by a manufacturer "a tax equivalent to 10 per centum of the price for which sold." [1] Sylvania duly paid the manufacturer's excise tax in connection with sales of the radios and televisions manufactured by its Radio and Television Division.

Sylvania's Radio and Television Division provided funds under a cooperative advertising plan for partially reimbursing retail dealers with respect to costs incurred by such dealers in locally advertising Sylvania radios and televisions. In the present litigation, it is contended that the funds which Sylvania devoted to such reimbursement purposes constituted price readjustments within the meaning of Section 3443(a) (2) of the Internal Revenue Code of 1939.

In anticipation that the original prices at which manufacturers sold the commodities affected by Chapter 29 of the 1939 Code, as amended—and on the basis of which the manufacturers computed and paid the excise taxes imposed by that chapter—might be readjusted downward as the result of subsequent happenings, Congress provided as follows in Section 3443 of the 1939 Code:

(a) A credit against tax under this chapter, or a refund, may be allowed or made—

\* \* \* \* \* \*

(2) to any person who has paid tax under this chapter with respect to an article, when the price on which the tax was based is readjusted \* \* \* by a bona fide discount, rebate, or allowance; in the amount of that part of the tax proportionate to the part of the price which is refunded or credited.[2]

Several years ago, in the case of General Motors Corporation v. United States, 277 F.2d 929, 149 Ct.Cl. 749 (1960), this court was first called upon to consider the question of whether amounts used by a manufacturer in partially reimbursing retail dealers under a cooperative advertising plan provided a proper basis for a refund of excise taxes under Section 3443(a) (2) of the Internal Revenue Code of 1939. General Motors sued for a partial refund of excise taxes previously paid in connection with sales by its Frigidaire Division of refrigerators to wholesale distributors.[3] Each wholesaler distributed the refrigerators in a defined and exclu-

1. Section 3404 originally prescribed a tax rate of 5 per centum (53 Stat. 411), but the rate had been increased to 10 per centum by the time that is involved in the present litigation (26 U.S.C. § 3404 (1946 Ed., Supp. V, and 1952 Ed.)).

2. This language, quoted from the original 1939 Code (53 Stat. 417), had not been changed as of the time involved in the present litigation.

3. The manufacturer's excise tax on mechanical refrigerators was imposed by Section 3405 of the Internal Revenue Code of 1939, as amended.

sive geographical area. This distribution was generally accomplished by selling such products to independent retail dealers, who, in turn, sold them to the ultimate consumers.

The Frigidaire Division had a cooperative advertising plan that was applicable to its refrigerators (and certain other products). When the Frigidaire Division sold to a wholesale distributor products which were covered by the plan, an accrual amounting to $1\frac{1}{4}$ percent of the suggested retail prices of such products was made to a cooperative advertising fund account that was maintained on the Frigidaire Division's books in the name of the particular distributor. The purpose of this account was to provide funds out of which retail dealers of Frigidaire products could be reimbursed for one-half of the costs incurred by them in locally advertising such products, if the advertising complied with certain standards prescribed by the Frigidaire Division in its cooperative advertising plan. The use of the following media for retail advertising under the plan was permissible: newspapers, radio, television, movie trailers, billboards, display materials, exhibits and shows, car cards, tabloids, advertising novelties, circulars, direct mail, and signs.

When local advertising of Frigidaire products was done by a retail dealer, the dealer submitted a claim, with supporting vouchers, to the appropriate wholesale distributor for one-half the cost of such advertising, if reimbursement under the Frigidaire Division's cooperative advertising plan was desired. The distributor examined the claim for errors and to determine whether there had been compliance with the provisions of the cooperative advertising plan in connection with the advertising on which the claim was based. If the distributor approved the claim, the distributor then forwarded it to the Frigidaire Division. Upon receiving a claim previously approved by the appropriate distributor, the Frigidaire Division examined the claim for errors and to determine whether there had been compliance with the provisions of the cooperative advertising plan. If the claim was allowed by the Frigidaire Division in whole or in part, reimbursement of the claimant in the proper amount was made by the Frigidaire Division, and the amount of the reimbursement was charged on the Frigidaire Division's books against the cooperative advertising fund account that was maintained in the name of the appropriate distributor.

General Motors sued in this court under Section 3443(a) (2) of the Internal Revenue Code of 1939 for a proportionate refund of the manufacturer's excise taxes paid on its refrigerators, the claim being based on the reimbursements to retailers under the Frigidaire Division's cooperative advertising plan. A divided court held (277 F.2d 929, 149 Ct.Cl. at p. 751) that when the Frigidaire Division partially reimbursed retail dealers for costs incurred in locally advertising products under the cooperative advertising plan, the Frigidaire Division thereby "readjusted" downward the prices at which its products had been sold. The majority opinion further said (277 F.2d at 931, 149 Ct.Cl. at p. 753) that "the only requirement of the statute [Section 3443(a) (2) of the 1939 Code] is that some of the money which the purchaser had paid for the property should be later refunded to the purchaser."

Subsequently, in three additional cases instituted by General Motors Corporation with respect to different tax periods, this court—again by a split decision—adhered to the position which it had taken in the 1960 opinion. The related cases are reported in 154 Ct.Cl. 866 (1961).

A different view of this same question was taken later by the United States Court of Appeals for the Second Circuit in the case of Waterman-Bic Pen Corporation v. United States, 332 F.2d 711 (1964). As of the time when that case arose, Section 3443(a) (2) of the Internal Revenue Code of 1939 had been replaced by Section 6416(b) (1) of the Internal Revenue Code of 1954 (68A Stat. 799), which provided in part as follows:

> If the price of any article in respect of which a tax, based on such price, is

imposed by chapter * * * 32 [relating to manufacturers' excise taxes], is readjusted * * * by a bona fide discount, rebate or allowance, the part of the tax proportionate to the part of the price repaid or credited to the purchaser shall be deemed to be an overpayment. * * *

Also, between the time when the cause of action arose and the date when the Court of Appeals rendered its decision, Section 6416(b) (1) had been amended by Section 2 of the Act of September 14, 1960 (74 Stat. 1017, 1018), which inserted, immediately after "or allowance," the phrase "including (in the case of a tax imposed by chapter 32) a readjustment for local advertising * * *."

The taxpayer contended that the sums which it had expended for advertising allowances to its vendees under a cooperative advertising plan, whereby the vendees locally advertised the taxpayer's products, should be regarded as price readjustments under Section 6416(b) (1) of the 1954 Code. This contention was rejected by the Court of Appeals, which stated (332 F.2d at p. 714) in part as follows:

* * * The purpose of § 6416(b) (1) is to prevent inequities attributable to fixing an arbitrary point in time as the date for determining the sales price by permitting a refund where subsequent events have resulted in the downward readjustment of the sales price. It was not intended to create an independent source of charges excludable from the sales price.

With respect to the 1960 amendment, which inserted in Section 6416(b) (1) of the 1954 Code a specific reference to "a readjustment for local advertising" as being deductible from the price on which the manufacturers' excise tax was computed, the Court of Appeals said (332 F. 2d at p. 716):

* * * [The amendment] obscures as much as it clarifies in telling us what Congress intended to tax originally. The legislative history indicates only that it was intended to clarify a very confused area of the law. * * * Indeed, it can just as well be argued that the very fact that Congress found it necessary to exclude local advertising specifically is evidence that it had not meant to do so previously. * * *

If, as held by the majority of this court in the *General Motors* cases, the prices at which the Frigidaire Division had sold its refrigerators were "readjusted" downward, within the meaning of Section 3443(a) (2) of the 1939 Code, when the Frigidaire Division partially reimbursed its retail dealers for local advertising conducted under the Frigidaire Division's cooperative advertising plan, it seems clear that the plaintiff in the present case is similarly entitled to a proportionate recovery of manufacturer's excise taxes in relation to the amounts which Sylvania's Radio and Television Division provided and used under its cooperative advertising plan for partially reimbursing retail dealers in connection with their local advertising costs on behalf of Sylvania radios and televisions. Although there were several differences between the cooperative advertising plan of Sylvania's Radio and Television Division and the cooperative advertising plan of General Motors' Frigidaire Division, these differences were not so basic as to make the reasoning of the majority opinion in the *General Motors* cases inapplicable to the present case.

One of the differences between the two plans was that whereas all the funds used under the Frigidaire Division's cooperative advertising plan were provided by the Frigidaire Division, Sylvania's Radio and Television Division did not provide all the funds that were used under its cooperative advertising plan. Sylvania's Radio and Television Division (like the Frigidaire Division of General Motors) sold its products to wholesalers. Each wholesaler was given the exclusive right to distribute Sylvania radios and televisions to retailers within an expressly defined geographical area; and the distributor had the responsibility for the

selection and appointment of suitable retail dealers within his trading area. When the Radio and Television Division shipped merchandise to a wholesale distributor pursuant to orders from the latter, the division added to the sales price a 2 percent billing for cooperative advertising. That amount was credited to the distributor's cooperative advertising account and became part of the distributor's advertising accrual. The division also credited an equal sum to the distributor's cooperative advertising account as a matching amount provided by the division. Thus, the wholesale distributors of Sylvania radios and televisions provided part of the funds for the cooperative advertising plan which is involved in the present case.

As retail dealers within a wholesale distributor's trading area conducted local advertising in accordance with the Radio and Television Division's cooperative advertising plan and submitted duly authenticated requests for reimbursement under the plan, they were reimbursed by the wholesale distributor for half of the costs incurred in connection with such advertising, and the distributor, in turn, was made whole by the Radio and Television Division out of the cooperative advertising fund account which the division maintained in the distributor's name and for which the distributor himself had provided part of the money.

However, the circumstance that the Radio and Television Division's wholesale distributors provided some of the funds that were used under the division's cooperative advertising plan does not take the present case outside the rationale of the majority opinion in the *General Motors* cases, in so far as the portion of the money provided by the Radio and Television Division itself was concerned. The findings of fact show the extent to which the funds used in effecting partial reimbursements to retail dealers under the cooperative advertising plan were provided by Sylvania's Radio and Television Division and the extent to which such funds were provided by wholesale distributors; and the plaintiff is seeking a recovery in the present case only with respect to the portion provided by Sylvania's Radio and Television Division. Under the reasoning behind the majority opinion in the *General Motors* cases, it would not seem to make any difference whether the cooperative advertising funds were provided wholly or only partially by the manufacturer, so long as the manufacturer's claim for a proportionate refund of excise taxes is based only upon the manufacturer's own outlay for cooperative advertising purposes.

It should also be noted that while the accruals of cooperative advertising funds in the *General Motors* cases were based solely upon percentages of sales by the manufacturer to wholesalers, this was not wholly true of the accruals of cooperative advertising funds in the present case. As new wholesale distributors were appointed by Sylvania's Radio and Television Division, the division set up on its books cooperative advertising fund accounts for the new distributors, and credited to them amounts deemed by the division as sufficient to enable the distributors to begin at once a program of making money available to retail dealers within their respective areas for cooperative advertising purposes. This was done without any relationship to sales of radios and televisions to the new distributors. Also, in some instances, the division credited supplemental amounts to the cooperative advertising fund accounts of certain wholesale distributors long after their original appointments. These supplemental sums were not based upon purchases of Sylvania products by the particular distributors, and they did not match funds provided by the distributors themselves. Instead, they were special allocations made by the Radio and Television Division out of its own funds to enable the particular distributors to make extra money available to their respective retail dealers for cooperative advertising, in order to meet unusual competitive situations.

Out of the total of $5,501,608.01 expended under the Radio and Television Division's cooperative advertising plan

during the period that is involved in the present litigation, $2,273,396.75 was provided by the division's wholesale distributors pursuant to the 2 percent charge on billings previously mentioned, an amount equal to the sum just mentioned was provided by the division in the form of matching funds, and $954,814.51 was provided by the division in the form of special allocations that had no direct relationship to sales of merchandise to wholesalers.[4] However, it was the circumstance that the manufacturer in the *General Motors* cases utilized its funds in partially reimbursing retailers for local advertising costs under a cooperative advertising plan that led the majority of the court in the *General Motors* cases to say that the manufacturer's prices for its commodities were thereby "readjusted" downward, rather than the circumstance that the particular funds used for the purpose had been accrued on the basis of percentages of sales prices. Consequently, the fact that $954,814.51 of the money utilized by Sylvania's Radio and Television Division under its cooperative advertising plan consisted of special allocations that had been made by the division without any direct relationship to sales of products by the division would not be a valid reason for taking the present case outside the scope of the majority opinion in the *General Motors* cases.

The majority opinion in the *General Motors* cases requires a holding in the present case that Sylvania's Radio and Television Division "readjusted" downward the prices at which it had sold Sylvania radios and televisions, to the extent that the Radio and Television Division provided funds for partially reimbursing retail dealers in connection with their local advertising costs under the division's cooperative advertising plan. Insofar as the cooperative advertising plan covered expenses which cannot fairly be characterized as advertising costs, but rather as promotional costs (see, e. g.,

finding 18(f)), such expenditures cannot be allowed, for the reasons given in the next section of this opinion.

### Spring Promotion Plan

Sylvania's Radio and Television Division observed that retail dealers tended to spend most of their advertising and promotional money during the most favorable part of the year, which (in connection with radios and televisions) began in the autumn and extended into the winter. Then, in the springtime—i. e., the months of March, April, May, and June—when the market for radios and televisions customarily "softens," dealers would have little or no money left to spend on the advertising and promotion of Sylvania radios and televisions. In order to meet this special problem, the Radio and Television Division in 1953 devised what was called the "spring promotion plan."

The spring promotion plan was devised in recognition of the fact that special techniques and emphases were required to stimulate business and move Sylvania radios and televisions in the "soft" spring market, thereby enabling Sylvania to maintain a competitive position in the industry.

A fund for the financing of the spring promotion plan was created and maintained by adding a special charge of one-half of 1 percent to all billings for merchandise sold to distributors. These amounts were credited to the several distributors' spring promotion accounts. The Radio and Television Division matched each such sum by itself providing an equal amount for the particular distributor's spring promotion account. These accruals to a distributor's spring promotion account occurred throughout the year, but the money was to be used exclusively for advertising and promotional activities during the springtime.

During the period from March 1, 1953, to December 31, 1954, inclusive, a total of approximately $436,500 was expended under the spring promotion plan. Half of

---

4.  These and other financial data contained in the report were offered by the plaintiff and admitted in evidence subject to verification by the defendant in the event that subsequent proceedings under Rule 47(c) (2) are necessary.

this amount was provided by Sylvania's Radio and Television Division, and half was provided by the division's distributors. A relatively small portion (approximately $34,800) of this amount was spent to reimburse dealers or distributors in connection with their advertising. The remainder was spent on discounts and special credits to distributors and dealers, and on various promotional activities.

The discounts allowed under the spring promotion plan were in addition to the discounts customarily allowed by the Radio and Television Division, and they usually related to slow-moving radio or television models. For example, the division's customary discount to distributors on radio and television models generally might be 30 percent, and the division would offer a springtime discount of 32 percent or 34 percent on slow-moving models. The additional discount on an order from a distributor for the specific slow-moving models would be charged to the particular distributor's spring promotion account.

An example of a special credit in the form of merchandise under the spring promotion plan would be the sale of 10 television sets for the price of 9, so that the amount represented by the price of the extra set would be a special credit in the form of merchandise.

Cash allowances were customarily granted to dealers under the spring promotion plan to offset price reductions announced in the spring by distributors on models then held by dealers in stock.

Under the spring promotion plan, distributors were sometimes encouraged to run contests among the dealers in their respective trading areas, awarding to the winning dealers prizes in the form of trips to the Radio and Television Division's Buffalo factory in order to see the modern techniques by which Sylvania products were manufactured. The winning dealers were guests of the division during such excursions. The expenses involved in these excursions were defrayed out of the spring promotion funds.

Sales promotion premiums were also made available under the spring promotion plan. These premiums included such things as television lamps or bases to be given by dealers in connection with sales of television sets, jackets with Sylvania insignia to be worn by dealers' salesmen or servicemen, and war bonds to dealers or their salesmen for the accomplishment of sales goals.

The Radio and Television Division's spring promotion plan was distinct from the division's cooperative advertising plan; and the funds which financed the spring promotion plan were separate and distinct from the cooperative advertising funds. From the procedural standpoint, the operation of the spring promotion plan was similar to the operation of the cooperative advertising plan. The paper work under the two plans was similar. The principal difference between the two plans, from the procedural standpoint, was that the spring promotion plan was seasonal in nature (except for the accrual of funds), whereas the cooperative advertising plan was in effect on a year-round basis.

The discounts to distributors and dealers on slow-moving models, the special credits in the form of merchandise, and the cash allowances on models in stock affected by price reductions, were the traditional types of price readjustments by way of discounts, rebates, or allowances that would seem clearly to come within the scope of Section 3443(a) (2) of the Internal Revenue Code of 1939. While it is true that each readjustment of this type was made out of a fund provided in part by Sylvania's Radio and Television Division and in part by the division's distributors, it is easy to segregate the portion (50 percent) provided by Sylvania from the portion provided by the distributors. In so far as the portion provided by Sylvania is concerned, therefore, it seems that such amounts should be regarded as properly forming a basis for a proportionate refund of excise taxes under Section 3443(a) (2).

The discussion in the previous part of this opinion relative to the Radio and Television Division's cooperative advertising plan is equally applicable to that

860

part of the money provided by the Radio and Television Division for the spring promotion plan and used to reimburse distributors or dealers for advertising costs.

With respect to the funds which the Radio and Television Division provided for the spring promotion plan and which were used for the purpose of reimbursing distributors or dealers in connection with promotional activities undertaken by them on behalf of Sylvania radios and televisions, we believe that many, if not all, of these activities fall outside of the *General Motors* decisions, and they would clearly be disallowed after the effective date of the 1960 amendment (covering only "a readjustment for local advertising") which has been previously mentioned. In the light of the 1960 amendment we decline to extend *General Motors* beyond its fair reach covering consumer advertising, and disallow such promotional expenses as prize trips, the giving of premiums like television lamps or bases or other products, jackets with Sylvania insignia, and excursions. War bonds to dealers or their salesmen are allowable as cash discounts or rebates under General Motors Corp. v. United States, 339 F.2d 648, 168 Ct.Cl. 301 (1964).

*Special Promotion Plan (Radio and Television Division)*

At about the end of 1953, Sylvania's Radio and Television Division concluded that, despite its national advertising (which is described in findings 14 and 15), the cooperative advertising plan discussed in the first part of this opinion, and the spring promotion plan discussed in the immediately preceding portion of the opinion, it was not getting its share of the radio and television market in many trading areas having good potentialities, especially in the large metropolitan centers of the country. An important factor in the division's relatively poor position was that Sylvania was a latecomer in the business of marketing radio and

television receiving sets. It first entered the television field as a manufacturer of television receiving sets in 1949, and the actual marketing of the sets to wholesale distributors was not begun until sometime during the first quarter of 1950. Sylvania also began the marketing of radio sets for the first time in the first quarter of 1950.[5] There were approximately 82 competing brands of radios and televisions on the market at the time when Sylvania entered the field.

In an effort to improve its competitive situation Sylvania's Radio and Television Division in December 1953 instituted a special promotion plan. Under this plan, a special promotion account was established for each distributor serving what was regarded by the division as a key trading area. All the funds for such accounts were provided by the Radio and Television Division, no charges or assessments being made against the distributors.

The funds in the special promotion accounts were available for use by distributors and their dealers in connection with advertising and promotional activities on behalf of Sylvania radios and televisions.

Expenditures under the special promotion plan were made on the basis of advertising or promotional programs submitted to the Radio and Television Division by distributors for their respective trading areas. In submitting a program to the division for approval, a distributor would list the dealers who would participate in the program.

The Radio and Television Division did not prescribe in advance any standard to govern expenditures under the special promotion plan. This plan required great flexibility in administration, and the division was inclined to approve any program that might be submitted by a distributor, since the division believed that the distributor should know what was needed for his particular market. The special promotion plan was designed

5. Previously, Sylvania's predecessor, the Colonial Corporation, had manufactured radio sets for a single customer, Sears Roebuck & Company, which sold the radio sets at retail under its own "Silvertone" brand name.

to help meet a critical competitive situation.

The forms used for the purpose of claiming reimbursement under the special promotion plan were similar to the forms used under the cooperative advertising plan and spring promotion plan.

Most of the money provided by the Radio and Television Division under the special promotion plan was used to reimburse distributors or dealers in connection with their advertising costs. Such expenditures were clearly within the scope of this court's opinion in the *General Motors* cases.

Some of the money provided by the Radio and Television Division under its special promotion plan was used in granting discounts and special credits to distributors and dealers, and some of the money was used to reimburse distributors and dealers in connection with promotional expenses. The discussion in the immediately preceding part of this opinion relative to expenditures out of the spring promotion plan for discounts and special credits to distributors and dealers, and for reimbursements to distributors and dealers in connection with promotional expenses, would be equally applicable to the similar expenditures made under the Radio and Television Division's special promotion plan. Rebates, discounts and special credits are allowable; promotional expenses are not allowable.

### Special Promotion Fund (Tube Divisions)

Sylvania had two Tube Divisions during the years that are involved in the present litigation, the Receiving Tube Division and the Picture Tube Division. These divisions manufactured and sold radio transmitting and receiving tubes, television picture and receiving tubes, and certain other electronic tubes. For all purposes relevant to this case, Sylvania's Tube Divisions may be considered as one division, because the promotional allowances respecting tubes that are involved in this case were made pursuant to one plan which covered both divisions.

Manufacturer's excise taxes were imposed by Section 3404 of the 1939 Code, as amended (26 U.S.C. § 3404 (1946 Ed., Supp. V, and 1952 Ed.)), on the tubes sold by Sylvania's Tube Divisions.

Sylvania's Tube Divisions marked their products through independent wholesalers, who were generally referred to as distributors. A typical distributor for the Tube Divisions was a wholesale seller of electronic parts of all kinds. His multiple lines of commodities customarily involved several thousand items, such as picture tubes, electronic parts, wire, and solder. Sylvania's tube distributors did not have exclusive geographical territories.

Sylvania's distributors of tubes sold such tubes to retail dealers. The dealers were repairmen who repaired radio and television sets. Some dealers maintained shops, while others operated out of their homes or garages.

Both the distributors and the dealers who handled Sylvania tubes competed with one another at their respective marketing levels. In addition to handling Sylvania tubes, they generally handled tubes manufactured by Sylvania's competitors as well.

During the years 1951–1954, Sylvania's Tube Divisions made allowances to distributors from a special promotion fund. The Tube Divisions created this fund by setting aside each month a certain percentage (between 1 percent and 3 percent, depending on the type of tube) of the amount paid for tubes by each distributor. This resulted in the establishment on Sylvania's books of a separate promotion account for each tube distributor and each distributor was advised of the current status and size of his promotion fund by monthly statements from Sylvania.

All the sums credited to the tube distributors' promotion accounts were provided by Sylvania. Unlike the cooperative advertising plan and the spring promotion plan maintained by Sylvania's Radio and Television Division, there was no requirement under the Tube Divisions' special promotion plan that distributors

provide part of the money required for the operation of the plan.

In creating the promotion plan for the Tube Divisions, it was Sylvania's intention to provide funds to assist tube distributors to move merchandise from their shelves to dealers. Such assistance was thought to be advisable because most tube distributors had started in business as repairmen and they were not skilled in sales techniques.

From time to time, Sylvania supplied its tube distributors with catalogs showing various articles which any distributor could order directly from Sylvania at the catalog price and charge the amount to his promotion fund, if he desired to do so. These articles included signs, window display kits, telephone book covers, Zippo lighters, salesmen's cards, shipping labels, calendars, clocks, service kits, tube chests, tools, technical manuals, and various other similar articles which the distributor might either retain or pass on to his dealers, at his discretion.

During the years 1952–1954, a portion of the expenditures from the Tube Divisions' special promotion fund resulted from two separate programs involving the use of scrip. The first of these was the "certificate program," whereby Sylvania at various times offered to its tube distributors one specific item, such as a chassis carrier for transporting television sets. For example, Sylvania informed its tube distributors that they could, if they desired to do so, purchase a chassis carrier from Sylvania for $16 on the following terms: each distributor would receive a $5 certificate with the purchase of every 750 receiving tubes; this $5 certificate could be used by the distributor only toward the purchase of the chassis carrier; and if the distributor desired to purchase the chassis carrier, he forwarded the $5 certificate to Sylvania, and the balance of the cost of the chassis carrier ($11) was charged to his special promotion fund.

Another plan involving the use of scrip pursuant to which expenditures were made from the Tube Divisions' special promotion fund was the "premium program." Under this program, each distributor was informed from time to time that he could order from Sylvania special premium certificates, the denominations of which were shown in numbers of tubes. For example, a distributor could order a stock of "50 tube" certificates, "100 tube" certificates, or "300 tube" certificates, and each such certificate was charged to the distributor's special promotion fund at the rate of 75¢, $1.50, or $4.50, depending on the denomination. If a dealer purchased 50, 100, or 300 tubes from the distributor, the latter was encouraged to give the dealer a "50 tube," a "100 tube," or a "300 tube" certificate, as the case might be. A dealer, having obtained these certificates as a result of purchases of tubes from his distributor, was entitled to make use of a special catalog (which Sylvania had distributed) in selecting gift items shown in the catalog, so long as the selecting dealer had in his possession the requisite number of tube certificates specified by the catalog as payment for the particular items.

The merchandise offered by Sylvania's Tube Divisions under the special promotion plan was offered at cost or at a price which produced a slight loss to Sylvania.

Tube distributors were also permitted to use their allocations of special promotion funds for other promotional purposes selected on their own initiative, such as the giving of antifreeze during the winter season to dealers in connection with sales of Sylvania picture tubes, and the painting of distributors' trucks with identification signs and the Sylvania emblem.

Sylvania did not prescribe in advance any standards to be used in determining whether a particular type of expenditure would be regarded as a proper charge against the Tube Divisions' special promotion fund. Any promotion plan that seemed likely to fulfill the intent of moving merchandise from a distributor's shelf to dealers was customarily approved by Sylvania under the plan.

Funds under the Tube Divisions' special promotion plan were used exclusively for promotional activities.

For the reasons previously given in this opinion we hold that the plaintiff's special promotion fund for the Tube Divisions cannot be taken into account in computing the tax refund. As far as we can tell, that fund covered promotional activities, not retail advertising, and was entirely comparable to the promotional parts of the Spring Promotion Plan and Special Promotion Plan of the Radio and Television Division.[6] Plaintiff urges that, because it did not prescribe any advance standards for the plan and customarily approved any likely project proposed to it, the Tube Divisions' promotion plan was in fact equivalent to a cash discount plan under which the distributors and dealers could use the money as they saw fit, for any purpose. The facts do not support that position. In greatest part the plan was limited to (i) the supplying of items and materials from special Sylvania catalogs, (ii) the "certificate program", and (iii) the "premium program." Even as to the minor part of the plan used for promotional purposes selected entirely on the distributors' own initiative, there is no showing that those receiving the funds could use them as freely, without restriction, as they could use cash.

### Conclusion

For the reasons set out in this opinion, the plaintiff is entitled to recover under Section 3443(a) (2) of the 1939 Code with respect to Sylvania's expenditures under the Radio and Television Division's cooperative advertising plan, part of the spring promotion plan, and part of the special promotion plan, but not with respect to the Tube Divisions' special promotion plan. Accordingly, judgment will be entered for the plaintiff on the issue of liability, and the case will be remanded to the commissioner for further proceedings under Rule 47(c) (2) to determine the amount of the recovery.

DAVIS, Judge (concurring):

I join the court's opinion but add some words on the relationship of this case to General Motors Corp. v. United States, 277 F.2d 929, 149 Ct.Cl. 749 (1960), and 154 Ct.Cl. 866 (1961) (the Frigidaire cases). Because of the intervening decision of the Second Circuit disagreeing with this court's *General Motors* (Frigidaire) opinion (Waterman-Bic Pen Corp. v. United States, 332 F.2d 711 (1964)), I would normally feel bound to evaluate anew the correctness of our position. See Mississippi River Fuel Corp. v. United States, 161 Ct.Cl. 237, 246, 314 F.2d 953, 958 (1963) (concurring opinion). In the present case, however, the defendant does not ask us to reconsider or overturn *General Motors* (Frigidaire), and the Congressional amendment of September 14, 1960, 74 Stat. 1017, 1018 (including within the concept of "readjustment" an allowance for local advertising) deprives *General Motors* (Frigidaire) of practical impact on taxable years following that change. This suit concerns 1951–1954, and so far as we know the issues it raises are "dead-end" in the sense that they will not arise after 1960. In these circumstances, I see no need to reconsider *General Motors* (Frigidaire) and concur with the court that it should be fairly applied, without reassessment, to the present case. On that premise I agree that, with respect to consumer advertising, the distinctions defendant draws are insignificant and immaterial. To accept them would be to reject the necessary holding of the earlier cases.

On the other hand, the 1960 amendment and the *Waterman-Bic* decision influence me not to extend *General Motors* (Frigidaire) beyond the compass fairly presented by its facts as this court understood them. That was a consumer or retail advertising case and did not involve promotional activities. Retail advertising can be considered as within the sphere of the distributor and dealer, not the manufacturer; but much, if not all, of the promotional activities we have here are properly characterized as expenses to be borne

---

6. If any expenditure under this plan did cover retail advertising, that portion should be taken into account along with the advertising aspects of the other plans.

by this plaintiff and within its sphere as manufacturer. In any event, I do not regard these promotional expenditures as a refund of part of the price paid by the purchaser.