**GENERAL MOTORS CORPORATION,**
**Plaintiff-Appellant,**

v.

**The UNITED STATES,**
**Defendant-Appellee.**

**Appeal Nos. 52–71, 453–71.**

United States Court of Appeals,
Federal Circuit.

June 15, 1983.

E. Alan Moorhouse, Detroit, Mich., for appellant. With him on brief were Otis M. Smith, Gen. Counsel, Paul H. Zalecki, Julius L. Russu and James A. Durkin. Ross L. Malone, Detroit, Mich., of counsel.

Allan C. Lewis, Washington, D.C., for appellee. With him on brief were Glenn L. Archer, Jr., Asst. Atty. Gen., Theodore D. Peyser and Robert S. Watkins, Washington, D.C.

Before MARKEY, Chief Judge, MILLER, Circuit Judge, and SKELTON, Senior Circuit Judge.

JACK R. MILLER, Circuit Judge.

Taxpayer ("GM") originated these actions under 26 U.S.C. § 6416(b)(1)[1] in the United States Court of Claims to recover manufacturers excise taxes alleged to have been improperly assessed and collected for the period January 1, 1961, through December 31, 1966, in the amount of $2,466,162 in tax and $48,935.88 in assessed interest in No. 52–71 and $5,179,840 in tax and $124,200 in assessed interest in No. 453–71, plus statutory interest. The trial judge filed a report on the merits (50 A.F.T.R.2d (P–H) 6274) on September 30, 1982, recommending a decision for the Government. Pursuant to this court's order of October 4, 1982, the Claims Court on October 8, 1982, ordered that judgment be entered in accordance with the trial judge's earlier report, and the final decision was then deemed to be on appeal to

---

1. 26 U.S.C. § 6416(b)(1) constitutes § 6416(b)(1) of the Internal Revenue Code of 1954, as amended, and provides as follows:

*Price readjustments.*—If the price of any article in respect of which a tax, based on such price, is imposed by chapter 32, is readjusted by reason of ... a bona fide discount, rebate, or allowance, including a readjustment for local advertising ... the part of the tax proportionate to the part of the price repaid or credited to the purchaser shall be deemed to be an overpayment. . . .

this court.[2] *Aleut Tribe v. United States,* 702 F.2d 1015, 1018 (Fed.Cir.1983). We affirm in part and reverse in part.

## BACKGROUND

During the period under consideration, GM made payments to dealers (or credited their parts accounts) under five demonstration programs: GMC Heavy-duty Truck Program, Chevrolet Heavy-duty Truck Program, Chevrolet Passenger Car Program, Chevrolet Light-duty Truck Program, and GMC Light-duty Truck Program.[3] The payments and credits were made on the basis of factory invoice net price to the dealer of the demonstrator vehicle (GMC and Chevrolet heavy-duty trucks only) or of manufacturer-designated optional equipment packages ordered by the dealer (on demonstrator GMC and Chevrolet light-duty trucks and Chevrolet passenger cars). These programs are discussed below:

*GMC Heavy-duty Truck Program*

During the mid-1950's, GMC Truck understood that its principal competitors in the heavy-duty truck field were, through their company-owned retail outlets, using demonstrators to conduct demonstrations (work tests) for prospective customers. These consisted of allowing such customers to use the vehicle in their regular service. To meet this competition, GMC Truck dealers, through their dealer councils, submitted requests to GMC Truck to give consideration to various approaches to aid dealers in making heavy-duty trucks more easily available for demonstration and display. In response, GMC Truck in 1958 devised and implemented the Heavy-duty Truck Program to help its dealers better understand the needs of customers and to increase its share of the heavy-duty truck market. Under the program, which was continued during the years involved in this case, a dealer was required to obtain approval of his zone manager before ordering a demonstration vehicle, which was owned and financed by the dealer. Under the program, participating dealers could receive payments (or credits) of 10 percent and 1½ percent of the factory invoice net price of the demonstration vehicle if, within 90 days of receiving the vehicle, the dealer conducted a minimum of 5 separate work test demonstrations of at least 500 miles per test and a minimum of 6,000 total miles. GMC Truck established a "detailed procedure for setting up and conducting the Heavy Duty demonstrations and for reporting the results thereof." Dealers were required to file a claim for payment within 150 days after receiving the vehicle. Operator reports were required upon completion of each work test. If the established procedure was not followed, payment to the dealer would not be made unless the deficiencies were corrected. The 10 percent payment was intended to offset the reduction in sale value from the vehicle's use in the work test demonstrations. The 1½ percent payment was intended to cover 50 to 60 percent of miscellaneous expenses on a demonstration vehicle, which GM Truck expected the dealer to underwrite, such as preparing it for demonstrations, mounting special equipment, repairs, maintenance, gasoline, licensing fees, and insurance.[4]

The phrase including readjustment for local advertising was inserted by Pub.L. No. 86–781, 74 Stat. 1017 (1960).

**2.** *This court's jurisdiction is based on section 127(a) of the Federal Courts Improvement Act of 1982, Pub.L. No. 97–164, 96 Stat. 25, 37–38 (to be codified at 28 U.S.C. § 1295(a)(3)) (1982).*

**3.** Two of the unincorporated divisions through which GM conducted business were GMC Truck and Coach Division ("GMC Truck") and Chevrolet Motor Division ("Chevrolet").

**4.** Prior to and continuing through the years under consideration, GMC Truck granted its dealers a 5 percent allowance on new and unused vehicles unsold and in the dealer's inventory on the day when it was publicly announced that the current model and body type was discontinued and a new model and body type substituted. Those vehicles eligible for the heavy-duty demonstrator 10 percent payments (credits) could not also receive the 5 percent model change allowance because GMC Truck management believed that the demonstrator payments (credits) were sufficient to prevent a dealer from incurring a substantial loss on resale.

*Chevrolet Heavy-duty Truck Program*

This program, which was established by Chevrolet in 1965, was essentially the same as the GMC Heavy-duty Truck Program.

*Chevrolet Passenger Car Program*

In 1961, Chevrolet established a passenger car demonstration program for model year 1962 under which a dealer received an allowance of from $26 to $55 on specified packages of options ordered with cars to be used as demonstrators and shipped by a certain date. No deviation in the items comprising an option package was permitted. The vehicles were required "to be placed in Demonstrator Service," although there was no requirement that they be used in demonstration for a minimum number of times or miles. A dealer was limited on the number of option packages that could be ordered. Applications for the allowance had to be submitted to Chevrolet by a certain date. Similar option package allowance programs were offered by Chevrolet during the 1963 through 1965 model years. Under these programs, the amount of the allowance was 20 percent of the dealer price for the option package, which came to $26 to $92. Option package allowances were not specifically tied to direct costs of vehicle demonstrations or decline in value due to use of the vehicles as demonstrators.[5] This program was designed to increase the number of Chevrolet passenger cars on the streets, thereby increasing the visibility of the Chevrolet product to the public, to provide the salesmen with a useful sales tool, the cost of which the dealers were reluctant to incur, and to sell more option packages.

*Chevrolet Light-duty Truck Program*

In July of 1961, Chevrolet announced its demonstrator program for the 1962 model year, establishing a national objective of selling 4,500 truck demonstrators to dealers. The program included allowances (credits to a dealer's parts account) on four option packages for two light-duty truck models, and these allowances are involved in this suit. The option packages included such items as "custom appearance," "custom comfort," "custom chrome," full view rear window, windshield washer and wipers, radio, V8 engines, wheel covers, and automatic or heavy-duty transmissions. The allowances ranged from $20 to $65. A dealer was required to submit an affidavit certifying that the demonstrators ordered with option packages were used for demonstration services during the four-month period of October through January of 1962, but "demonstration services" was not defined, and no minimum amount of such services was specified. Regional and zone managers were instructed to keep a record of the demonstrators shipped to dealers in order to check the information in the dealers' affidavits and allowance claims. However, no verification of a dealer's actual use of a vehicle as a demonstrator was made.

The number of specially-equipped, light-duty truck demonstrators that could be ordered under the option package allowance program depended on the number of dealer salesmen, the dealer being permitted to order one demonstrator for each six salesmen or fraction thereof. There were two reasons for that limitation: first, to give all dealers an opportunity to obtain a reasonable number of light-duty trucks early in the model year; and second, to limit the financial advantage that any single dealer could have from the allowances.

Substantially similar option package demonstrator allowance programs to that for 1962 were established for the 1963 through 1966 model years. Beginning with 1964, allowances were changed to 20 percent of the dealer net price of the option packages. No minimum period of demonstrator service was prescribed, and dealers were no longer required to certify that a demonstrator had been used in demonstration service for a four-month period. The number of demonstrators eligible for the option package allowances was based on the number of demonstrators unsold on June 30 of the model year and could not exceed the number of

---

**5.** The demonstration vehicles were eligible for 5 percent model change allowances, which are not in issue here.

demonstrators ordered in October of the model year. A dealer would secure his allowances by submitting an application between June 30 and September 30 following the end of that model year program.

The reason for the option package allowance program was to provide dealers a financial inducement to add specified options to vehicles that were ordered as demonstrators.

*GMC Light-duty Truck Program*

This program, which was established for 1965 and 1966, was essentially the same as the Chevrolet Light-duty Truck Program.

### ANALYSIS

The trial judge correctly observed that a price readjustment that will generate an excise tax refund or credit occurs when the manufacturer lowers the price of an article by making a payment to the dealer that is in consideration of retailing expenses incurred by the dealer, as opposed to manufacturing expenses which must remain as a part of the sale price on which the manufacturers excise tax is imposed. He properly stated that a manufacturer cannot pay a dealer to perform some portion of the manufacturers function and thereby gain a reduction in the manufacturers excise tax by claiming that the price on which the tax is imposed has been lowered as a result of such payments to the dealer. However, in deciding for the Government, the trial judge relied heavily on *General Telephone & Electronics Corp.* ("Sylvania") *v. United States,* 176 Ct.Cl. 904, 364 F.2d 853 (Ct.Cl. 1966), which he concluded had "ruled that promotional expenses did not constitute bona fide discounts, rebates or allowances." A close reading of the opinion in Sylvania indicates that this conclusion is an oversimplification of the opinion.

In analyzing Sylvania's "Cooperative Advertising Plan," the Court of Claims stated

that the majority opinion in the General Motors cases [6] required a holding that Sylvania's Radio and Television Division "readjusted" downward the prices at which it sold Sylvania radios and televisions, to the extent that the Radio and Television Division provided funds for partially reimbursing retail dealers in connection with their local advertising costs under the division's Cooperative Advertising Plan. Insofar as the plan covered expenses which could not "fairly be characterized as advertising costs," [7] the Court of Claims said "such expenditures cannot be allowed [to readjust downward the prices as a basis for refund of excise tax], for the reasons given in the next section of this opinion."

The next section of the opinion is headed "Spring Promotion Plan." Under this "promotion" plan, there were three activities: (1) discounts to distributors and dealers on slow-moving models, special credits in the form of merchandise, and cash allowances on models in stock affected by price reductions, all of which the court said clearly came within the scope of the discount, rebate, or allowance provision of the Internal Revenue Code; (2) reimbursements to distributors and dealers for advertising costs (a relatively small portion of the money in the plan fund was used for this), which the court treated in the same manner as the reimbursements for advertising under the Cooperative Advertising Plan; and (3) reimbursements to dealers and distributors for "promotional activities" (for prize trips, premiums like television lamps or bases, jackets with Sylvania insignia, and excursions), which the court held not allowable for readjustment downward of prices as a basis for refund of excise tax.

The next section of the opinion is headed "Special Promotion Plan." Under this promotion plan, which Sylvania instituted "to

---

**6.** *General Motors Corp., Frigidaire Division v. United States,* 149 Ct.Cl. 749, 277 F.2d 929 (1960), and three other GMC cases reported in 154 Ct.Cl. 866 (1961).

**7.** E.g., a "special promotion plan known as Sylvania's TV Seabreeze Cruise" under which

expenses of dealers, who qualified by purchasing a specified number of television sets, were categorized by Sylvania as "special promotion" and paid from the Cooperative Advertising Plan fund.

help meet a critical competitive situation," there were three activities: (1) discounts and credits to distributors and dealers, which the court held allowable, as in the Spring Promotion Plan; (2) reimbursement to distributors and dealers for advertising costs, also held allowable; and (3) reimbursements to dealers and distributors for "promotional expenses" (not specifically identified), held not allowable as in the case of "similar expenditures" under the Special Promotion Plan.

The last section of the opinion is headed "Special Promotion Fund (Tube Divisions)." Under this promotion plan, which was established by Sylvania "to provide funds to assist tube distributors to move merchandise from their shelves to dealers," the funds were used "exclusively for promotional activities," namely: (1) for articles ordered by dealers from Sylvania-furnished catalogs (signs, window display kits, telephone book covers, Zippo lighters, salesmen's cards, shipping labels, calendars, clocks, service kits, tube chests, tools, technical manuals, and various other similar articles), which the distributor could retain or pass on to his dealers; (2) two separate programs involving the use of scrip to enable distributors and dealers to purchase merchandise at cost or a slight loss to Sylvania. The court concluded that these funds were comparable to the "promotional parts of the Spring Promotion Plan and the Special Promotion Plan of the Radio and Television Division," and held that they could not be taken into account in computing an excise tax refund.

Thus, the Court of Claims determined that expenditures by Sylvania for discounts to distributors and dealers and for reimbursements to distributors and dealers for advertising costs, although carried out under various "promotion plans," were allowable for readjustment downward of prices as a basis for refund of excise tax; whereas, expenditures for reimbursements to dealers and distributors for "promotional expenses" consisting of the costs of *such items* as prize trips, premiums like television lamps or bases, jackets with Sylvania insignia, excursions, cruises, signs, window display kits, telephone book covers, Zippo lighters, salesmen's cards, shipping labels, calendars, clocks, service kits, tube chests, tools, technical manuals, and various other similar articles, were not. Accordingly, the opinion in the *Sylvania* case cannot properly be deemed dispositive of the question whether GMC's payments to dealers under the five auto and truck demonstration programs are allowable for readjustment downward of prices as a basis for refund of excise tax.[8]

The question remains whether the demonstrator and option packages programs were at least *predominantly* "within the realm of the manufacturer," to borrow a phrase from the trial judge's opinion,[9] or predominantly within the realm of the dealers.

With respect to the payments to dealers, appellant places great reliance on *General Motors Corp.* ("Pontiac") *v. United States,* 168 Ct.Cl. 301, 339 F.2d 648 (Ct.Cl.1964), where Pontiac paid $25 to its dealers for each specified 1954 Pontiac sold during a stated time period provided the dealers

---

**8.** The dissenting opinion states that the court in *Sylvania* held that rebates for "promotional expenses" were not allowable to a manufacturer for readjustment downward of prices as a basis for refund of excise tax. More precisely, the court disallowed certain *specific* promotional expenses, as detailed above in this opinion. At the same time, however, as related above, the *Sylvania* court held that other "promotion plan" expenditures (discounts and credits to distributors and dealers and reimbursements to distributors and dealers for advertising costs) *were allowable.* Thus, the label "promotion" or "promotional" is not decisive; whereas, the specific nature of the expenditure is. (As pointed out in note 1, *supra,* Congress amended

the Internal Revenue Code in 1960 to specifically allow readjustment for local advertising costs.)

**9.** We use the word "predominantly" advisedly. The trial judge found that the programs were clearly of *mutual* benefit to GMC and its dealers and that there are aspects of the programs "which could be categorized as retailing." He noted that neither of the parties had attempted to apportion the payments between retailing and manufacturing aspects of the programs but, instead, had argued for an all-or-nothing approach.

proved that they had paid a corresponding amount to their salesmen responsible for the sales. (The Internal Revenue Service had allowed payments to dealers of $75 for each Pontiac sold under a bonus plan as a price readjustment in computing the manufacturers excise tax.) In holding that the $25 payments were allowable as a price readjustment, the court said that the $25 payments and the $75 payments comprised a "totally integrated bonus plan," and that "The success of this plan certainly was partially, and even largely attributable to the additional $25 payment." 339 F.2d at 651. The Government responds that the court rejected its position in Pontiac "because the salesmen were not under the control of the manufacturer," thus distinguishing the $25 payments in Pontiac from the payments to dealers on demonstrator options in this case. The court did, indeed, conclude that there was no element of control by Pontiac over the dealers' salesmen in rejecting the Government's position that the case was controlled by *F.W. Fitch Co. v. United States,* 323 U.S. 582, 65 S.Ct. 409, 89 L.Ed. 472 (1945).[10]

Appellant also relies upon language quoted by the *Pontiac* court from *General Motors Corp., Frigidaire Division v. United States,* 149 Ct.Cl. 749, 277 F.2d 929, 930–31 (Ct.Cl.1960), which states generally the manufacturer's motivations in granting bona fide discounts, rebates, or allowances. However, the holding in *Frigidaire* had to do with payments to dealers under a cooperative advertising plan, and such payments were expressly made allowable for price

readjustment by an amendment to the statute a few months after the *Frigidaire* decision. (*See* note 1, *supra.*) We have no quarrel with the general statement of manufacturer's motivations, which does not attempt to provide guidelines for determining when payments by a manufacturer are predominantly within the realm of the manufacturer; nor is the factor of control in making that determination discussed. Significantly, the reports of the House Ways and Means Committee and the Senate Finance Committee accompanying the bill that became Pub.L. No. 86–781 (S.Rep. No. 1916, 86th Cong., 2d Sess. 3, *reprinted in* 1960 U.S.Code Cong. & Ad.News 3798, 3800, H.R.Rep. No. 2103, 86th Cong., 2d Sess. 2), stated:

> Your committee concluded that due to the confusion as to the status of advertising charges, in determining manufacturers' sales prices, there was need for statutory clarification, as well as some limitations as to the extent to which such exclusions or adjustments should be allowed. Your committee concluded that it is appropriate to exclude from the manufacturers' sales price a reasonable amount of local advertising where the advertising is under the *control* of the distributor. [Emphasis added.]

Accordingly, we conclude that the element of control is decisive in determining whether the demonstrator and option packages programs were predominantly within the realm of the manufacturer or predominantly within the realm of the dealers.[11]

---

10. The dissenting opinion asserts that the majority opinion uses a "new control test." However, this ignores that the tax-writing committees of Congress established this test in 1960 (*see infra*) and that the Court of Claims used it four years later in the *Pontiac* case. The dissenting opinion says that the latter usage had to do with the "master-servant relationship" of the manufacturer and the dealers' salesmen, and "had nothing to do with a test for an allowance of a rebate or discount for excise tax purposes." On the contrary, it had everything to do with the allowance of the rebate, for if the salesmen had not been under the dealers' control, and, instead, had been within the realm of the manufacturer, the rebate or discount would not have been allowed.

11. Our conclusion rests on the statute, this court's precedent, and legislative history shown in the reports of the tax-writing committees of Congress. The Government also relies on Treas.Reg. § 48.6416(b)–1(b)(5), which provides, in part that—

> repayments made to the vendee do not effectuate price readjustments if given in consideration of circumstances under which he has been or is required to incur an expense which, if treated as a separate item in the original transaction and not included in the price billed for the taxable article, would nevertheless have been includible in the price of the article for purposes of computing the tax. For example, ... repayments made by a manufacturer to his vendee in considera-

This conclusion is entirely consistent with the Court of Claims' opinions in the *Frigidaire* and *Sylvania* cases, and the dissenting opinion's citation to *South Corporation v. United States,* 690 F.2d 1368 (Fed.Cir.1982), is inapposite.

■ As to the 10 percent payments under the two heavy-duty truck work test demonstration programs, although GM management looked to the dealers to physically conduct the vehicle demonstrations, these programs were established by GM in response to resolutions of dealers, many of whom could not afford the economic burden involved in conducting demonstrations; and, the programs were controlled by GM, which promulgated the required detailed procedures for conducting demonstrations and for reporting the results thereof. Therefore, we are persuaded that the work test demonstrations were predominantly within the realm of the manufacturer. The record sufficiently supports the trial judge's conclusion that the 10 percent payments were not allowable for readjustment downward of prices of the demonstration vehicles as a basis for refund of excise tax.

■ With respect to the 1½ percent payments under the two heavy-duty truck demonstration programs, it does not appear that these were reimbursements for activities controlled by GM, but, rather, for miscellaneous expenses incurred by the dealers on demonstration vehicles. We are satisfied that such expenses related to activities that were, at least, predominantly within the realm of the dealers.[12] The conclusion of the trial judge that the 1½ percent payments were not allowable for readjustment downward of price of the demonstrator vehicles is not sufficiently supported in the record.

■ Regarding the allowances made to dealers for option packages, although the degree of control in the involved programs was not as great as with the 10 percent payments under the two heavy-duty truck work test demonstration programs, we are persuaded that the programs were predominantly within the realm of the manufacturer. We note, particularly, that the vehicles involved had to be used as demonstrators, the number of demonstrator vehicles that could be ordered with the option packages was limited,[13] the make-up of the packages could not be altered, and the time period for making application was specified. Accord-

tion of an expenditure made or to be made by the vendee ... for demonstration or display of the manufacturer's product by the vendee, do not effectuate price readjustments.

Appellant argues that reduction in sale value from a vehicle's use in a work test demonstration is not an "expenditure." We need not decide this point and merely note that a long-standing Treasury regulation carries considerable weight, especially where, as here, the statute (26 U.S.C. § 6416(b)) provides for promulgation of regulations by the agency.

12. GM argues that "demonstrating a vehicle to a prospective retail purchaser is probably the quintessential retail expense." Although demonstration vehicles were owned by the dealers and direct contact with a customer was by the dealer, this argument overlooks the difference between expenses incurred by dealers in preparing and maintaining vehicles for demonstration, which activities were not controlled by GM, and loss in value of demonstrators under the work test demonstration programs, which were controlled by GM. GM also argues that it and its dealers treated the demonstration vehicle allowances as "the economic equivalent of GM's model change and carryover allowances, which are concededly bona fide rebates."

However, this argument overlooks the fact that the demonstration vehicle allowance program was controlled by the manufacturer and was predominantly within the manufacturer's realm, whereas, inventories of vehicles affected by model changes were obviously owned and controlled by the dealers and were predominantly within the dealers' realm. GM argues further that the allowances to dealers were "fungible" and could be used in whatever manner the dealers chose—just as in the case of model change allowances. However, this argument not only misses the difference in control, but would not seem to be apposite where allowances were credited to the dealers' parts accounts.

13. James E. Conlon, who was Chevrolet's Assistant General Sales Manager for trucks during most of the involved years, testified that "we wanted to put control on [the number of demonstrators that could be ordered with option packages] so that one dealer could not order an inordinate number of units under the program and have an unfair distribution of the product."

ingly, we hold that the record sufficiently supports the trial judge's conclusion that the payments (credits) to dealers under the option package programs were not allowable for readjustment downward of prices of the packages as a basis for refund of excise tax.

The decision of the Claims Court is affirmed in part and reversed in part, with remand for determination of quantum.

AFFIRMED IN PART, REVERSED IN PART, and REMANDED.

SKELTON, Senior Circuit Judge, concurring in part and dissenting in part.

I concur with the result reached by the majority denying recovery to the appellant on its claims for rebates of excise taxes relating to the 10 percent payments (or credits) which appellant allowed or paid to its dealers in connection with its GMC Heavy-Duty Program and its Chevrolet Heavy-Duty Program, and relating to the allowances appellant made to its dealers as a part of its Chevrolet Passenger Car Program and its Chevrolet Light-Duty Program, and its GMC Light-Duty Program, and with its affirmance of the United States Claims Court judgment denying recovery on such claims. However, I do not agree with some of the reasoning set forth in the majority opinion.

I respectfully dissent as to that part of the majority opinion that allows the appellant a rebate of taxes in connection with the 1½ percent allowance paid by appellant to its dealers in connection with its GMC Heavy-Duty Truck Program and its Chevrolet Heavy-Duty Truck Program, and which, to that extent, reverses the judgment of the Claims Court.

At the outset, I point out that by an en banc decision of this court in *South Corporation v. United States,* 690 F.2d 1368 (Fed. Cir.1982), we are required to follow the decisions of our predecessor court, the United States Court of Claims. That court has established by at least two en banc decisions certain tests and guidelines for the determination of when and under what circumstances a rebate for excise taxes will be

allowed to a manufacturer for payments or allowances made by it to its dealers in connection with the sale of its products. In *General Motors Corporation, Frigidaire Division, v. United States,* 149 Ct.Cl. 749, 277 F.2d 929 (Ct.Cl.1960), the court held that a rebate will be allowed to a manufacturer for reimbursements or allowances made to its dealers for "local advertising" paid for by the dealers. The court reaffirmed this holding in *General Telephone & Electronics Corporation v. United States,* 176 Ct.Cl. 904, 364 F.2d 853 (Ct.Cl.1966), and in the same case held that rebates by a manufacturer to its dealers for "promotional expenses" are not allowable, as these are properly the expenses of the manufacturer in promoting its products.

Thus, in these cases, the Court of Claims laid down two tests or guidelines to be used to determine if a rebate is allowable, namely, whether an allowance to a dealer is in payment for local advertising by the dealer, and, if so, the rebate is allowed, and whether the allowance is for promotional expenses, and, if so, the rebate is not allowed.

When these tests and guidelines are used in the instant case, it is clear that the only way the appellant would be entitled to a rebate for the 1½ percent allowance it made to its dealers in connection with its two heavy-duty truck programs would be to show that the allowance was in payment of "local advertising" of the dealers. An examination of the items making up the allowances indicates conclusively that this cannot be done. These items, as described in the majority opinion, were miscellaneous expenses of the dealer in preparing a truck for demonstration, including "mounting special equipment, repairs, maintenance, gasoline, licensing fees, and insurance." There is no way that these items could be classified as "local advertising" expenses of the dealer. Consequently, the test and requirement set forth by the Court of Claims in the above cases has not been met, and the claim of appellant for the 1½ percent rebate for such allowance should be denied.

Furthermore, the 1½ percent allowance was no different than the 10 percent allowance made by the manufacturer to its dealers where a rebate was not allowed. Both allowances were part and parcel of the same promotional programs and should be treated the same way. The promotional test enunciated by the Court of Claims has been met, and, therefore, rebates for both the 1½ percent and the 10 percent allowance should be denied.

A more serious aspect of the majority opinion in the instant case is presented by its failure to follow the decisions of the Court of Claims in the *General Motors* and *General Telephone* cases cited above. In this regard, the majority opinion ignores the "local advertising" and "promotional expenses" tests and guidelines set forth in those opinions that are to be used to determine whether a rebate will be allowed to a manufacturer for a credit or payment to its dealers in connection with the sale of its products. Instead of following these mandates of the Court of Claims, as it is required to do, the majority proposes and applies a new and different test to determine whether a rebate will be allowed. This new test is "control". In this regard, the majority opinion states:

> Accordingly, we conclude that the element of control is decisive in determining whether ... the programs were predominantly within the realm of the manufacturer or predominantly within the realm of the dealers.

The majority then says, in total disregard of the tests prescribed in the Court of Claims decisions, that if the dealers control the program the manufacturer is entitled to a rebate, but if the manufacturer controls the program, the rebate is not allowed.

Using this new control test, the majority then proceeds to hold that the dealers were in control of the two 1½ percent heavy-duty truck programs covering miscellaneous expenses of the dealers (none of which were local advertising expenses of the dealers), and, therefore, the manufacturer is entitled to a rebate for paying such expenses. This is a prime example of how a manufacturer can be allowed a rebate under the control test when it could never receive such a rebate under the local advertising test required by the decisions of the Court of Claims. Furthermore, under the control test, it is possible that a manufacturer could place any kind of program—even one that is promotional—under the control of its dealers and thereby receive a rebate of taxes for payments to its dealers. This would completely circumvent the decisions of the Court of Claims, and would deprive the government of huge sums of excise taxes.

The reliance of the majority on the word "control" used by the Court of Claims in discussing the collateral and ancillary issue of whether salesmen of a dealer were employees of the manufacturer in *General Motors Corporation v. United States,* 168 Ct.Cl. 301, 339 F.2d 648 (Ct.Cl.1964) is misplaced. In that case the manufacturer reduced the price of 1954 model Pontiac automobiles by $75.00 to induce its dealers to buy them before the 1955 models were issued. The IRS allowed the $75.00 as a genuine rebate or discount. The manufacturer also paid its dealers an additional $25.00 in repayment of the same amount the dealers had paid their salesmen as an incentive to sell the 1954 models. The IRS denied this $25.00, contending that under these circumstances the salesmen were employees of the manufacturers. The Court of Claims held otherwise, saying:

> We are, however, unable to accept the basic premise that the salesmen became plaintiff's employees. There was no element of *control or right to control* by plaintiff over the dealer's salesmen present. Plaintiff had no right to hire and fire, no right of supervision, withheld no taxes, and did not pay the salaries. Further, there is no indication that either plaintiff or the salesmen believed plaintiff to be the employer. A determination that plaintiff was the employer of the salesmen for the purpose of the $25 payment would lack reality. (Emphasis supplied.) 329 F.2d at 652.

There is no other reference in the opinion to "control" or "right to control". The above

reference to these words was directed to the master and servant relationship, *vel non,* of the manufacturer and the dealers' salesmen, and had nothing to do with a test for an allowance of a rebate or discount for excise tax purposes. There is no indication in the opinion that the court intended to establish the word "control" thus used on a collateral issue as a test for the allowance of a rebate.

Furthermore, the court did not use control to decide that case on the merits. The decision of the court is reflected in the following paragraphs:

As we have shown, the $25 payments were such a necessary and integral part of the plan, and the two payments were so closely interrelated, that it was erroneous for the Commissioner not to also designate the $25 portions as rebates or discounts. The plan embodied a single method of accomplishment, i.e., to allow a rebate or discount. The components were two-fold, i.e., the $75 payments and the $25 payments. In determining whether the plan was a rebate or discount, the Commissioner should not have separated the components. 339 F.2d at 651.

*We have here a pure rebate or discount.* The Commissioner of Internal Revenue even conceded that it was a rebate or discount to the extent of the $75 payments. We have merely held that he was in error when he attempted to separate and disallow the other necessary component of the plan. This is a far cry from determining whether or not advertising expenses may constitute a rebate or discount.... (Emphasis supplied.) 339 F.2d at 653.

The subsequent payments by dealers to salesmen were part of the overall plan of rebate or discount. As we previously stated, both the $25 and $75 were necessary for the success of the plan. They cannot, therefore, be separated. 339 F.2d at 654.

The above excerpts from the court's opinion show without question that the case was decided on the sole basis that the $25.00

payments were a part and parcel of a "pure rebate or discount" plan, and that "control" had nothing to do with it.

In my opinion, the majority has taken the word "control" out of context in the general comments of the court on the ancillary issue of whether the salesmen were employees of the manufacturer, and is using it to set up a new and different test to determine whether a rebate will be allowed. This is contrary to the cited cases of the Court of Claims.

It appears that by adopting the control test to the exclusion of the tests prescribed by the Court of Claims, the majority has, either expressly or by implication, overruled the above cited en banc decisions of that court. This is beyond the authority of our panel.

Finally, Trial Judge Merow has written an excellent opinion, which has been approved by the judgment of the Claims Court. I would affirm that judgment in all respects and deny the appellant a recovery on all of its claims for rebates.